

JCC/CRC: USAO 2019R00034

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. PX21CR331 |
| | * | |
| JONATHAN CARTU, | * | (Conspiracy to Commit Wire Fraud, |
|    a/k/a "Jon Cartier," | * | 18 U.S.C. § 1349; Wire Fraud, |
|    a/k/a "Edward Cole," | * | 18 U.S.C. § 1343; Aiding and Abetting, |
| DAVID CARTU, | * | 18 U.S.C. § 2; Forfeiture, 18 U.S.C. |
| JOSHUA CARTU, | * | § 981(a)(1)(C), 21 U.S.C. § 853, |
| LEEAV PERETZ, | * | 28 U.S.C. § 2461) |
|    a/k/a "Lee Cole," | * | |
| NATANEL PERETZ, | * | |
|    a/k/a "Nati Peretz," | * | |
|    a/k/a "Steven Grey," | * | |
| GERY SHER, | * | |
| DANIEL BENVENISTE, | * | |
|    a/k/a "Ryan Daniels," | * | |
| ROY BADASH, | * | |
|    a/k/a "Jonathan Taylor," | * | |
| BEN KONDIOTI, | * | |
|    a/k/a "Frank Born," | * | |
| DROR COHEN, | * | |
|    a/k/a "Fabio Morganelli," and | * | |
| CHARLES POLLACK, | * | |
|    a/k/a "Julian Almieda," | * | |
| | * | |
| Defendants | * | |
| | * | |

\*\*\*\*\*\*\*

## INDICTMENT

### COUNT ONE
(Conspiracy to Commit Wire Fraud)

The Grand Jury for the District of Maryland charges that:

### Introduction

At all times relevant to this Indictment:

### Relevant Entities

1.     Tracy PAI was an Israel-based company that marketed and sold binary options to

individual client victims throughout the world, including in the District of Maryland. Tracy PAI employees marketed and sold binary options to client victims through electronic and wire communications, including email, phone, chat and/or messaging services, and websites.

2. Tracy PAI operated several binary options brands (collectively, the "Cartu Binary Options Brands"). The following Cartu Binary Options Brands were the outward-facing part of the conspiracy, and Tracy PAI employees held themselves out as representatives of the following Cartu Binary Options Brands in communications with clients and potential clients:

   a. Bee Options was a binary options brand operated by Tracy PAI between in or around January 2013 and in or around June 2017;

   b. Glenridge Capital was a binary options brand operated by Tracy PAI between in or around August 2015 and in or around June 2017; and

   c. Rumelia Capital was a binary options brand operated by Tracy PAI between in or around January 2015 and in or around June 2017.

3. Business 1 was an Ireland-based company that offered payment processing services to Tracy PAI, in support of the Cartu Binary Options Brands, as well as to other binary options entities. As a payment service provider, Business 1 processed client deposits and payments for binary options brands and, in exchange, received a percentage of the client funds that it processed.

### Relevant Binary Options Terms

4. A binary option was a type of option contract in which the payout depended on the outcome of a discrete event, typically related to whether the price of a particular asset—such as a stock or a commodity—would rise above or fall below a specified amount. Unlike traditional options, a binary option did not provide the purchaser with the right to buy or sell the underlying asset. Rather, a binary option typically provided a fixed payout (typically around 75% of the

amount traded) if the client won the trade and resulted in a total loss if the client lost the trade. For example, a client could purchase an option for $100 predicting that the price of a specified stock would be above $150 in one hour from the time of purchase. If the price of that stock was above $150 when the option expired an hour later, the client's account would be credited $175 (the initial $100 plus a 75% return). If the price of the specified stock was below $150 when the option expired, the client would lose the entire $100 investment.

5. A "deposit" referred to money sent to a binary options brand by a client, often by credit card charge or wire transfer. "Net Deposits" represented a client's deposits minus any withdrawals a client was able to make from his account.

6. "Conversion" referred to the process of converting or attempting to convert a prospective binary options client into an actual client by obtaining an initial deposit of funds. A "conversion agent" or "conversion representative" was a salesperson responsible for contacting potential binary options clients with the objective of obtaining an initial deposit.

7. "Retention" referred to the process of obtaining and attempting to obtain additional deposits from binary options clients who had already made at least one initial deposit. As part of the "retention" process, Tracy PAI employees were also responsible for preventing clients from withdrawing money they had deposited. An "Account Manager" (sometimes called a "retention agent" or "retention representative") was a Tracy PAI employee responsible for performing retention services. Retention representatives sometimes referred to themselves as "brokers," "traders," or "agents," to clients.

### The Defendants and Other Relevant Individuals

*The Principals – The CARTU Brothers*

8. Defendant **JONATHAN CARTU**, a/k/a "Jon Cartier," a/k/a "Edward Cole,"

("**JONATHAN CARTU**") was a resident of Israel.

9. Defendant **DAVID CARTU** was a resident of Israel and Ireland.

10. Defendant **JOSHUA CARTU** was a resident of Israel and Hungary.

11. From at least in or around April 2013 through at least in or around 2017, **JONATHAN CARTU**, along with his brothers, **DAVID CARTU** and **JOSHUA CARTU**, were the principals of Tracy PAI and Business 1. Among other things, **JONATHAN CARTU**, **DAVID CARTU**, and **JOSHUA CARTU** owned and operated the Cartu Binary Options Brands and shared in the profits of the scheme.

*Retention Agents, Managers, and Other Employees*

12. Defendant **LEEAV PERETZ**, a/k/a "Lee Cole," ("**LEEAV PERETZ**") was a resident of Israel. From at least in or around June 2013 through at least in or around February 2017, **LEEAV PERETZ** was an employee of Tracy PAI. Beginning in or around May 2016, **LEEAV PERETZ** was named Chief Executive Officer of Tracy PAI.

13. Defendant **NATANEL PERETZ**, a/k/a "Nati Peretz," a/k/a "Steven Grey," ("**NATANEL PERETZ**") was a resident of Israel. From at least June 2013 through at least in or around February 2017, **NATANEL PERETZ** was an employee of Tracy PAI who oversaw retention agents, as well as other aspects of the scheme, including marketing campaigns to target potential binary options client victims.

14. Defendant **GERY SHER** ("**SHER**") was a resident of Israel. From at least in or around September 2013 through at least in or around February 2017, **SHER** was a retention agent at Tracy PAI who held himself out to client victims as a representative of Bee Options and Glenridge Capital. **SHER** also trained other retention agents, including advising on stage names and scripts to use to solicit binary options client victims.

15. Defendant **DANNY BENVENISTE**, a/k/a "Ryan Daniels," ("BENVENISTE") was a resident of Israel. From at least in or around October 2014 through at least in or around February 2017, **BENVENISTE** was a retention agent at Tracy PAI who held himself out to client victims as a representative of Glenridge Capital and Bee Options.

16. Defendant **ROY BADASH**, a/k/a "Jonathan Taylor," ("BADASH") was a resident of Israel. From at least in or around August 2014 through at least in or around February 2017, **BADASH** was a retention agent at Tracy PAI who held himself out to client victims as a representative for Glenridge Capital, Rumelia Capital, and Bee Options.

17. Defendant **BEN KONDIOTI**, a/k/a "Frank Born," ("KONDIOTI") was a resident of Israel. From at least in or around November 2014 through at least in or around February 2017, **KONDIOTI** was a retention agent at Tracy PAI who held himself out to client victims as a representative of Glenridge Capital and Bee Options.

18. Defendant **DROR COHEN**, a/k/a "Fabio Morganelli," ("COHEN") was a resident of Israel. From at least in or around March 2016 through at least in or around February 2017, **COHEN** was a retention agent at Tracy PAI who held himself out to client victims as a representative of Glenridge Capital and Rumelia Capital.

19. Defendant **CHARLES POLLACK**, a/k/a "Julian Almieda," ("POLLACK") was a resident of Israel. From at least in or around August 2014 through at least in or around February 2017, **POLLACK** was a retention agent at Tracy PAI who held himself out to client victims as a representative of Bee Options and Glenridge Capital.

20. Individual 1 was a Tracy PAI employee from in or around December 2013 through at least in or around 2017, who worked on marketing campaigns to recruit binary options victims to the Cartu Binary Options Brands, including emails, videos, and other promotional campaigns

that were used to target potential binary options victims.

### Victims of the Scheme

21. The defendants and their co-conspirators targeted client victims throughout the world and in the United States, including Victim A, Victim B, Victim C, Victim D, and Victim E, all of whom were residents of Maryland.

22. As a result of the scheme orchestrated by the defendants and their co-conspirators, client victims worldwide lost in excess of $60 million.

### The Conspiracy

23. Beginning in or around 2013 and continuing through at least in or around 2017, the exact dates being unknown to the Grand Jury, in the District of Maryland and elsewhere, the defendants,

> **JONATHAN CARTU,**
> a/k/a "Jon Cartier,"
> a/k/a "Edward Cole,"
> **DAVID CARTU,**
> **JOSHUA CARTU,**
> **LEEAV PERETZ,**
> a/k/a "Lee Cole,"
> **NATANEL PERETZ,**
> a/k/a "Nati Peretz,"
> a/k/a "Steven Grey,"
> **GERY SHER,**
> **DANIEL BENVENISTE,**
> a/k/a "Ryan Daniels,"
> **ROY BADASH,**
> a/k/a "Jonathan Taylor,"
> **BEN KONDIOTI,**
> a/k/a "Frank Born,"
> **DROR COHEN,**
> a/k/a "Fabio Morganelli," and
> **CHARLES POLLACK,**
> a/k/a "Julian Almieda,"

did knowingly and intentionally combine, conspire, confederate, and agree with each other and others, known and unknown to the Grand Jury, including Individual 1, to commit wire fraud, that

6

is, having devised and intending to devise any scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and omissions (the "scheme to defraud"), and for the purpose of executing and attempting to execute the scheme to defraud, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals pictures, and sounds, in violation of 18 U.S.C. § 1343.

### Purpose of the Conspiracy and Scheme to Defraud

24. The defendants and their co-conspirators profited based on "net deposits" made by client victims — that is, the amount of money people sent to the Cartu Binary Options Brands minus any money clients were able to withdraw. It was the purpose of the conspiracy and scheme to defraud for the defendants and their co-conspirators to unlawfully enrich themselves by (1) obtaining the maximum deposit from client victims and (2) preventing client victims from withdrawing money in their accounts.

### Manner and Means of the Conspiracy

It was part of the conspiracy and scheme to defraud that:

*Overview of the Scheme to Defraud*

25. The defendants' scheme to defraud victims consisted of three main stages:

   a. ***First***, the defendants and their co-conspirators identified and targeted potential client victims using false and fraudulent videos and advertisements distributed through email, social media, and other marketing campaigns. During the course of the scheme, the defendants and their co-conspirators contracted with external, third-party, "affiliate marketers" to funnel traffic to the Cartu Binary Options Brands and also established an internal "marketing department" to develop and disseminate false marketing campaigns and materials and generate

"leads" for potential client victims. These marketing campaigns often included email testimonials and videos featuring fictitious characters and trading results that contained false and misleading claims about, among other things, the suitability of binary options "investments" being advertised and the historical performance of other clients in binary options. Individuals who viewed these videos and expressed an interest in receiving additional information were directed to binary options brand websites, including the websites for the Cartu Binary Options Brands.

      b.     **_Second_**, once a potential client victim responded to a marketing campaign, the client's name and contact information would be sent to "conversion" and the potential client would be contacted by a "conversion agent," who would attempt to collect required paperwork from clients and to obtain deposits from clients who had not previously made a deposit.

      c.     **_Third_**, after a client victim made an initial deposit, the client would be referred to "retention." A retention agent would then contact the client by email, phone, and other methods to promote purported "trades" and investment strategies, all for the purpose of convincing the client to send additional funds. A client could be — and often was — contacted by multiple retention agents over the course of the scheme. Once a client victim was referred to retention, the defendants and their co-conspirators sought to induce the client to deposit as much money as possible, while also preventing the client from withdrawing money from his account.

26. Throughout the scheme, the defendants and their co-conspirators took a number of steps to deceive and mislead client victims and to prevent clients from withdrawing funds from their accounts, including the following:

      a.     Making false statements and material omissions about the nature of investments in binary options, including, but not limited to: rates of return and profits on trading binary options; the level of risk involved in trading binary options; and the alignment of financial

incentives between client victims and the defendants and their co-conspirators;

      b.     Making false statements and material omissions about the names, qualifications, and physical location of representatives;

      c.     Delaying or, in some instances, refusing client victim requests to withdraw funds from their accounts, and making false statements and material omissions about clients' access to funds in their accounts;

      d.     Placing a "bonus" or "risk-free" or "insured trade" in a client's account; and

      e.     Manipulating internal settings, including "risk settings" and the "spread" on client victim accounts, to make it more (or, in rare cases, less) likely a client victim would lose trades. By increasing a client's chance of losing, the defendants and their co-conspirators effectively caused clients to deplete their accounts, causing clients to believe they did not have funds available to even request to withdraw.

    27.    The defendants and their co-conspirators used the methods described in Paragraphs 25 and 26 above to target and recruit client victims worldwide, including in the United States, to solicit deposits, and to prevent client victims from withdrawing funds, all in order to maximize profit for the defendants and their co-conspirators at the expense of their victims.

<em>False Statements and Material Omissions Regarding the Nature of<br>Purported "Investments" in Binary Options</em>

    28.    The defendants and their co-conspirators made and caused to be made materially false statements and failed to disclose material information to client victims about the nature of investments in binary options, including false statements about rates of return and profit on binary options, the level of risk involved in purchasing binary options, and the nature and safety of binary options trading.

    29.    In truth and in fact, most binary options client victims lost money, and the

incentives between client victims and the defendants and their co-conspirators;

    b.    Making false statements and material omissions about the names, qualifications, and physical location of representatives;

    c.    Delaying or, in some instances, refusing client victim requests to withdraw funds from their accounts, and making false statements and material omissions about clients' access to funds in their accounts;

    d.    Placing a "bonus" or "risk-free" or "insured trade" in a client's account; and

    e.    Manipulating internal settings, including "risk settings" and the "spread" on client victim accounts, to make it more (or, in rare cases, less) likely a client victim would lose trades. By increasing a client's chance of losing, the defendants and their co-conspirators effectively caused clients to deplete their accounts, causing clients to believe they did not have funds available to even request to withdraw.

    27.    The defendants and their co-conspirators used the methods described in Paragraphs 25 and 26 above to target and recruit client victims worldwide, including in the United States, to solicit deposits, and to prevent client victims from withdrawing funds, all in order to maximize profit for the defendants and their co-conspirators at the expense of their victims.

<em>False Statements and Material Omissions Regarding the Nature of<br>Purported "Investments" in Binary Options</em>

    28.    The defendants and their co-conspirators made and caused to be made materially false statements and failed to disclose material information to client victims about the nature of investments in binary options, including false statements about rates of return and profit on binary options, the level of risk involved in purchasing binary options, and the nature and safety of binary options trading.

    29.    In truth and in fact, most binary options client victims lost money, and the

defendants and their co-conspirators knew that it was unlikely, if not impossible, to guarantee success or specific rates of return in any binary options trade. Yet, the defendants and their co-conspirators, including retention agents **SHER**, **BENVENISTE**, **BADASH**, **KONDIOTI**, **COHEN**, and **POLLACK**, Individual 1, and others known and unknown, working under the supervision and at the direction of **JONATHAN CARTU**, **JOSHUA CARTU**, **DAVID CARTU**, **LEEAV PERETZ**, and **NATANEL PERETZ**, concealed from client victims that most binary options client victims lost money and that it was the goal of the defendants and their co-conspirators to have clients lose money. In addition, the defendants and their co-conspirators falsely represented to client victims that they would likely profit if they traded in binary options through the Cartu Binary Options Brands. For example:

    a.    In or around February 2016, **BADASH** contacted Victim E in Maryland by phone and falsely claimed to be a trader based in Dublin, Ireland, with more than 25 years of experience who could guarantee a minimum of 30-40% rates of return on a monthly basis.

    b.    In or around April 2016, **KONDIOTI** contacted Victim A in Maryland by phone to encourage Victim A to make additional binary options trades and falsely promised that Victim A could recoup at least $120,000 by trading binary options.

30. The defendants and their co-conspirators also created and circulated scripts, templates, and other internal Tracy PAI documents for use with client victims that contained false and misleading statements about the nature of binary options trading. For example, on or about April 8, 2015, a script to use in soliciting money from client victims was circulated among Tracy PAI employees, including **LEEAV PERETZ**, **KONDIOTI**, and **BADASH**. The script referred to clients as "fish" and began "[b]ecause most clients are like fish this should work for everyone." Among other things, the script directed Tracy PAI employees to falsely promise that "[t]he average

Client completes the turnover requirement within the 100 days, and makes an average of 70-80% profits." The script also provided introductory questions for retention agents to use:

> After you spend the first couple minutes shooting the shit start asking him more personal questions, get a feeling for HOW MUCH MONEY HE HAS, and HOW BRIGHT A LIGHT DO WE NEED TO SHINE TO ATTRACT SAID FISH.
>
> Do you have experience trading binary?
>
> If no that's ok you got a great opportunity for many reasons. (He's a virgin, never been taken before meaning, you can pitch bonuses, cash accounts NFP's.) The golden opportunity here is he pretty much doesn't understand that all brokers are scammers yet.
>
> If yes than FANTASTIC. (We have fish that has been caught before.) We now ask our fish how much have you lost in the past with other companies, (this is important because if he has lost 50k with another company he can afford to lose it with you.)

31. In addition to making misrepresentations about the nature and safety of binary options trading, the defendants and their co-conspirators also concealed material information from client victims, including that the interests of the Cartu Binary Options Brands were not aligned with clients' interests. That is, the profits for defendants and their co-conspirators were based on client victim net deposits (i.e., client victim deposits minus withdrawals), not on successful trades or profits made by client victims. Thus, retention agents **SHER**, **BENVENISTE**, **BADASH**, **KONDIOTI**, **COHEN**, and **POLLACK**, Individual 1, and others known and unknown, working under the supervision and at the direction of **JONATHAN CARTU**, **JOSHUA CARTU**, **DAVID CARTU**, **LEEAV PERETZ**, and **NATANEL PERETZ**, were incentivized and directed to maximize deposits and minimize withdrawals; however, the defendants and their co-conspirators falsely represented to clients that their profits were based on client profits and trading successes.

*False Statements and Material Omissions Regarding the Names, Qualifications, and Physical Location of Representatives*

32. The defendants and their co-conspirators, including retention agents **SHER**, **BENVENISTE**, **BADASH**, **KONDIOTI**, **COHEN**, and **POLLACK**, Individual 1, and others

11

known and unknown, working under the supervision and at the direction of **JONATHAN CARTU, JOSHUA CARTU, DAVID CARTU, LEEAV PERETZ**, and **NATANEL PERETZ**, made or caused to be made materially false statements and failed to disclose material information to binary options client victims about the names, qualifications, and physical locations of agents.

33. The defendants and their co-conspirators falsely represented to client victims that they had training and experience in financial markets and that they had degrees in banking, finance, or related fields. In truth and in fact, the defendants and their co-conspirators had virtually no relevant experience or education in in accounting, trading, or the financial markets. In addition, the defendants and their co-conspirators used fake titles in their email signature blocks to mislead clients into believing they worked for legitimate investment firms. For example:

   a. On or about November 11, 2014, **BENVENISTE** sent an email to a client victim describing himself as a "Head Analyst," with Bee Options and falsely claiming he had a "personal 83% success rate."

   b. On or about June 15, 2015, **KONDIOTI** sent an email to a client victim describing himself as a "senior analyst" for Bee Options who promised to provide "trading signals which will have at least 80% success rate on a long term."

34. The defendants and their co-conspirators concealed their true names and identities from clients and used fake names or "stage names" when talking to client victims.

35. The defendants and their co-conspirators concealed the fact that they were calling client victims from Israel and falsely claimed to be located in London, or in other cities with established financial markets, rather than in Israel.

36. The defendants and their co-conspirators circulated scripts via email that included lies about the experience of Tracy PAI employees, including claiming "I've worked for CitiGroup,

HSBC, And AIG and have Traded Binary Options Professionally for years."

*False Statements, Misrepresentations, and Efforts to Prevent Client Withdrawals*

37.     The defendants and their co-conspirators, including retention agents **SHER**, **BENVENISTE**, **BADASH**, **KONDIOTI**, **COHEN**, and **POLLACK**, and others known and unknown, working under the supervision and at the direction of **JONATHAN CARTU, JOSHUA CARTU, DAVID CARTU, LEEAV PERETZ**, and **NATANEL PERETZ**, conspired to prevent client victims from withdrawing money, including delaying or, in some instances, refusing client victim requests to withdraw funds from their accounts and making materially false statements and failing to disclose material information to clients about whether and the circumstances under which client victims would be able to withdraw funds from their accounts

38.     Rather than allowing client victims to withdraw funds when asked, defendants and their co-conspirators set a "withdrawal budget" and would only approve withdrawals within that budget.  Yet the defendants and their co-conspirators did not reveal to client victims that their withdrawal requests would be subject to this "budget."  To the contrary, the defendants and their co-conspirators falsely told client victims they could withdraw funds at any time and that their withdrawal requests were being processed and the funds would be available.  For example, in or around March 2016, **JONATHAN CARTU, LEEAV PERETZ**, and **NATANEL PERETZ** discussed making modifications to the Tracy PAI platform used by client victims, including a setting that would allow a client to only have a single withdrawal request pending at a time.  With respect to the purpose of this change, **NATANEL PERETZ** explained "Thats the point it is good for us to delay the client."

39.     While the defendants and their co-conspirators often denied client victim withdrawal requests, in certain circumstances the defendants and their co-conspirators allowed

client victims to withdraw funds as a "test" — to falsely lure clients into believing that they could easily withdraw their funds at any time. For example:

      a.    On or about July 9, 2015, **BADASH** requested that a withdrawal be approved so that the client victim would deposit additional funds, writing "he [the client] says that he checks the withdraw and if its fine he will put 10 k."

      b.    On or about February 26, 2016, **BENVENISTE** sent **LEEAV PERETZ** a request to approve a $10,000 withdrawal for a client victim in the United States, asking, "Can we get it out so I can take fresh blood from him ?"

      c.    On or about September 5, 2016, a retention agent emailed **LEEAV PERETZ** and **NATANEL PERETZ** with the request "**Withdrawal test from cash account!!!!!** PLEASE authorize this withdrawal, this fool is a big fish and going to drop over 100k if I can keep up the good rapport." **LEEAV PERETZ** responded "ok."

*Using "Bonuses" to Further the Scheme to Defraud*

40.    The defendants and their co-conspirators, including retention agents **SHER**, **BENVENISTE**, **BADASH**, **KONDIOTI**, **COHEN**, and **POLLACK**, and others known and unknown, working under the supervision and at the direction of **JONATHAN CARTU**, **JOSHUA CARTU**, **DAVID CARTU**, **LEEAV PERETZ**, and **NATANEL PERETZ**, used "bonuses" as a tactic to both encourage client victims to deposit additional funds and prevent client victims from requesting withdrawals.

41.    A "bonus" was an amount of purported funds that a Tracy PAI employee could add to a client's account to be used in trading. "Bonuses" were often accompanied by burdensome "turnover" requirements—such as requiring that the client trade 30 times the amount in the account before withdrawing funds—making it extremely difficult for clients to withdraw these funds.

Tracy PAI employees also offered "risk-free" or "insured" trades to clients and represented that any losses incurred on these trades would be reimbursed to the clients. The reimbursement was in the form of a bonus, which came with the burdensome turnover requirements making it extremely difficult for client victims to withdraw funds.

42. The defendants and their co-conspirators would place a bonus in a client's account so that the client victim would then be subject to onerous turnover requirements and thus unable to make a withdrawal.

43. The defendants and their co-conspirators pitched "insured trades" or "risk-free trades" to client victims, falsely implying that clients would be reimbursed for any losses and therefore faced no risk in connection with these trades. In reality, the reimbursement for losses on insured or risk-free trades was made in the form of a bonus, which included the onerous turnover requirements set up to lock clients' money in their accounts.

44. The defendants and their co-conspirators knew that representations regarding "insured" trades were false when they made them to client victims. For example:

    a. On or about July 17, 2015, **LEEAV PERETZ**, upon reviewing one fraudulent pitch email relating to a purported trade, told employees, "Guys do not send this to your clients. We can't say in writing that the bank insured the trades. Over the phone different story."

    b. On or about August 31, 2016, **SHER** sent an email to clients, including clients in the United States, soliciting deposits and offering "Risk Free Trades," which **SHER** explained meant that "any losses […] will be returned to your trading account."

*Manipulating "Risk" Settings to Further the Scheme to Defraud*

45. The defendants and their co-conspirators, including retention agents **SHER, BENVENISTE, BADASH, KONDIOTI, COHEN,** and **POLLACK,** and others known and

15

unknown, working under the supervision and at the direction of **JONATHAN CARTU**, **JOSHUA CARTU**, **DAVID CARTU**, **LEEAV PERETZ**, and **NATANEL PERETZ**, manipulated the trading platforms utilized by the Cartu Binary Options Brands to alter the likelihood that client victims would win trades. By making it more or less likely that a client victim could win trades, the defendants and their co-conspirators both induced clients to deposit additional funds and prevented clients from making withdrawals.

46. The defendants and their co-conspirators manipulated risk settings and the spread on client accounts to prevent a client from winning trades, thus preventing a client from building up cash in his account that he could request to withdraw. For example:

   a. On or about July 7, 2014, **LEEAV PERETZ** sent an email to risk management with the request a client victim's name and account number in the subject line and stating "Please make this client go broke."

   b. On or about May 26, 2016, **BADASH** emailed **LEEAV PERETZ** and **NATANEL PERETZ** regarding a client victim's account with the subject line, "Plz put a bad spread on him.. he is making money on the cash , 67152."

   c. On or about August 10, 2016, **LEEAV PERETZ** sent an email regarding Victim A, who had been recruited by **KONDIOTI**, stating "I risked them hard. This client will not come off risk until funds are gone[.]"

47. Conversely, the defendants and their co-conspirators requested to have a client victim placed on the platform's "low risk" setting to give the client the false impression that he was generating returns on his investment and thus induce him to deposit more.

18 U.S.C. § 1349

## COUNTS TWO THROUGH FIVE
### (Wire Fraud)

The Grand Jury for the District of Maryland further charges that:

1. Paragraphs 1 through 22 and 24 through 47 are realleged and incorporated herein by reference.

### The Scheme to Defraud

2. Beginning in or around 2013 and continuing through in or around 2017, the exact dates being unknown to the Grand Jury, in the District of Maryland and elsewhere, the defendants,

> JONATHAN CARTU,
> a/k/a "Jon Cartier,"
> a/k/a "Edward Cole,"
> DAVID CARTU,
> JOSHUA CARTU,
> LEEAV PERETZ,
> a/k/a "Lee Cole,"
> NATANEL PERETZ,
> a/k/a "Nati Peretz,"
> a/k/a "Steven Grey,"
> GERY SHER,
> DANIEL BENVENISTE,
> a/k/a "Ryan Daniels,"
> ROY BADASH,
> a/k/a "Jonathan Taylor,"
> BEN KONDIOTI,
> a/k/a "Frank Born,"
> DROR COHEN,
> a/k/a "Fabio Morganelli," and
> CHARLES POLLACK,
> a/k/a "Julian Almieda,"

devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and omissions (the "scheme to defraud").

### The Charges

3. On or about the dates set forth below, in the District of Maryland and elsewhere,

the defendants,

>JONATHAN CARTU,
>a/k/a "Jon Cartier,"
>a/k/a "Edward Cole,"
>DAVID CARTU,
>JOSHUA CARTU,
>LEEAV PERETZ,
>a/k/a "Lee Cole,"
>NATANEL PERETZ,
>a/k/a "Nati Peretz,"
>a/k/a "Steven Grey,"
>GERY SHER,
>DANIEL BENVENISTE,
>a/k/a "Ryan Daniels,"
>ROY BADASH,
>a/k/a "Jonathan Taylor,"
>BEN KONDIOTI,
>a/k/a "Frank Born,"
>DROR COHEN,
>a/k/a "Fabio Morganelli," and
>CHARLES POLLACK,
>a/k/a "Julian Almieda,"

for the purpose of executing and attempting to execute the scheme to defraud, did knowingly and intentionally transmit and cause to be transmitted by means of wire communications, in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit:

| Count | Approximate Date | Description of Interstate and Foreign Wire |
|---|---|---|
| 2 | October 24, 2016 | Email from Victim B in Maryland to Glenridge Capital Compliance in Israel. |
| 3 | November 24, 2016 | Email from **BENVENISTE** in Israel to Victim C in Maryland. |
| 4 | December 16, 2016 | Email from **COHEN** in Israel to Victim D in Maryland. |
| 5 | January 22, 2017 | Email from Glenridge Capital Compliance in Israel, to Victim A in Maryland, copying **KONDIOTI**. |

18 U.S.C. § 1343
18 U.S.C. § 2

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1. Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), in the event of the defendants' conviction under any of the offenses charged in Counts One through Five of this Indictment.

### Wire Fraud and Wire Fraud Conspiracy Forfeiture

2. Upon conviction of the offenses charged in Counts One through Five of this Indictment, the defendants,

**JONATHAN CARTU,**
a/k/a "Jon Cartier,"
a/k/a "Edward Cole,"
**DAVID CARTU,**
**JOSHUA CARTU,**
**LEEAV PERETZ,**
a/k/a "Lee Cole,"
**NATANEL PERETZ,**
a/k/a "Nati Peretz,"
a/k/a "Steven Grey,"
**GERY SHER,**
**DANIEL BENVENISTE,**
a/k/a "Ryan Daniels,"
**ROY BADASH,**
a/k/a "Jonathan Taylor,"
**BEN KONDIOTI,**
a/k/a "Frank Born,"
**DROR COHEN,**
a/k/a "Fabio Morganelli," and
**CHARLES POLLACK,**
a/k/a "Julian Almieda,"

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to such offenses.

**Substitute Assets**

3. If, as a result of any act or omission of any defendant, any proceeds subject to forfeiture:

    a. cannot be located upon the exercise of due diligence;

    b. have been transferred or sold to, or deposited with, a third party;

    c. have been placed beyond the jurisdiction of the court;

    d. have been substantially diminished in value; or

    e. have been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States of America, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above.

18 U.S.C. § 981(a)(1)(C)
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

*Jonathan F. Lenzner/jcc*
Jonathan F. Lenzner
Acting United States Attorney

Joseph S. Beemsterboer
Acting Chief, Fraud Section
Criminal Division, Department of Justice

A TRUE BILL:

**SIGNATURE REDACTED**

Foreperson

Date: 8/25/21

20